Anthony Olvera is entitled to a writ of habeas corpus in this account to build a new university murder case because the Illinois Appellate Court failed to properly apply Strickland v. Washington in two ways. First, it acted contrary to Strickland by conducting prejudice analysis using a would-have-resulted-in-an-acquittal standard. Second, it unreasonably applied Strickland by failing to analyze Olvera's claim that his counsel's investigation of his defenses, particularly self-defense, was objectively deficient. And under de novo review, which applies pursuant to epidemic circumstances, Olvera has shown that he is entitled to issuance of a writ or, in the alternative, an evidentiary hearing. First, the Appellate Court erred by finding no prejudice from counsel's performance because the new evidence from Robby Espinoza's affidavit would not, quote, have resulted in an acquittal. Espinoza's affidavit attested to the fact that Olvera never confessed to him to ordering the shooting, contrary to the testimony of another witness at trial who claimed to have overheard this confession to Espinoza. The proper standard of prejudice to apply to Espinoza's affidavit set forth in Strickland is reasonable probability of a different result. And, according to Strickland, that is defined as sufficient to undermine confidence in the outcome. The Appellate Court's failure to apply that standard is clearly contrary to Strickland. Indeed, it is undisputed that it would have resulted in an acquittal standard is contrary to Strickland based on Strickland's itself, and it's the example the Court gave in the Williams case as what it means to be contrary. And the District Court itself identified the use of this language as troubling. Nor was it appropriate for the District Court to assume that the Appellate Court actually applied the correct standard of prejudice despite saying otherwise. There are only two cases in which the Supreme Court has identified an improper statement of the prejudice standard as, quote, imprecise shorthand. The first, in Holland v. Jackson, is where a state court previously, in its opinion, quoted the full Strickland definition of prejudice, including the language of sufficient to undermine confidence in the outcome. The second is Woodford v. Viscotti, where the Supreme Court looked at the state court opinion, and the state court opinion contained a thorough definition of Strickland, and that it specifically did not require that the defendant show he would have been acquitted. Neither of those circumstances is present here, and there's no reason or no basis to defer and assume that the State Appellate Court applied a standard different than the one it articulated. And in fact, this circuit, in both Mosley v. Atkins and Jones v. Calloway, has specifically found that when a state court uses the phrase would have resulted in an acquittal, that is an application of Strickland that is contrary to federal law and de novo review applies. When we apply de novo review to Mr. Espinoza's affidavit, it's clear that his affidavit undermines confidence in the outcome. His affidavit contradicted the only credible witness's testimony that Olvera had confessed, and there's simply no minimizing the evidentiary importance of testimony from a credible witness who says she heard a confession. Now, the state court points to the testimony of Rhodes and says, well, he also claims that Mr. Olvera confessed. But Mr. Olvera is the prototypical, uncredible witness. He was a jailhouse snitch who was exchanging testimony for a more lenient sentence. And it's well-established in precedent from the Supreme Court and in this court that the weakness of a prosecution case matters. And here, that case was weak. It relied upon the testimony of a jailhouse snitch and circumstantial evidence of Mr. Olvera's involvement in the shooting. And here, all that evidence amounted to was that he was present at the crime scene. He was present at the shooting. Now, we also know from state law that presence at the shooting is not, or presence at a crime scene or presence in flight, is not enough of a basis to hold someone accountable. That's all that was here. Jailhouse snitch and presence. Other than Montalvo and Espinoza undermined Montalvo. For that reason, failure as well to talk to Mr. Espinoza was deficient performance. His affidavit undermining the credible testimony of a confession was key. And all the state points to in this regard is that maybe he wouldn't have been the best witness to testify, but whether he would have been the best witness to testify is not relevant to the question that was before the appellate court about failure to investigate. Relatedly, the appellate court unreasonably applied sprinkling regarding the finding of deficient performance as to the other six affidavits. The state pursued two theories of accountability. That Olvera shared criminal intent with Delgado, as evidenced by him purportedly ordering Delgado to shoot, or that Olvera was accountable under a common criminal design, meaning that he drove to the crime scene with Delgado, and he knew Delgado supposedly had a gun. The affidavits at issue undermined both of those theories. The appellate court, however, unreasonably applied sprinkling by failing to consider that Olvera's claim was about his counsel's failure to investigate his defense, particularly his defense of self-defense, prior to trial. Instead, the court, this is the state court, in simply one paragraph, disposed of all of the evidence and all of the affidavits and assumed that counsel knew what these witnesses were going to say, and that he made strategic decisions not to use their affidavits, not to use their testimony, and as to what trial strategy to pursue. Case law is clear, however, that it is ad pet error to simply assume a counsel's decision are strategic in the absence of any evidence as to what motivated those decisions. And there's a lot of case law in this circuit on that, cases such as Jones v. Callaway, Mosley v. Atkins, more recently Dunn v. Jess. That's just error, and it's been identified by this circuit, this circuit, and also the Supreme Court, for instance, in Wiggins, as error to just assume that a counsel's decisions were strategic in the absence of any record to show that. And here, the known evidence from the time of the grand jury stage was that Delgado shot in response to the Kings rushing the car. That evidence at hand warranted further investigation into self-defense, and it was entirely deficient for counsel not to have pursued that. There was even other testimony at trial from the witness behind Olvera's car that she saw someone running. There was testimony from Rea in the car that she heard no one say, shoot, before the round of shots were fired. The state's position is, well, self-defense wouldn't have been viable, but in fact, that's an improper assumption. Self-defense involves fact determinations, and the key fact determination that should have been investigated was whether shooting in self-defense was warranted, who was the aggressor at the point the shots were fired. Those are all issues of fact, and there was ample evidence that at the time the shots were fired, they were fired in self-defense. And we point out two points to this court. One is that self-defense is a complete defense to a first-degree murder charge. But the second one is that even a mistaken belief in self-defense would require a jury to be instructed on the lesser offense of second-degree murder. Now, when we then move to de novo review of the prejudice standard, because the state court, under the prejudice standard, because the state court didn't reach that issue, we submit to the court that the affidavits that the court so readily dismissed based upon the assumption counsel knew the contents of what these witnesses would say, undermine, they show reasonable doubt, reasonable probability that the result of the proceedings would be different. They show that Olvera had not invited Delgado to come with him to pick up Rhea, and that Delgado threatened him after the first round of shots, and that the shots were fired in self-defense. I see I'm into my rebuttal, so I'm going to reserve my remaining time. Thank you. Thank you, Ms. Messer. Ms. George? Yes, good morning, Your Honor. May it please the Court, I'm Assistant Attorney General Kathryn Dorsch on behalf of the Respondent Warren. The state court judgment was not contrary to Strickland. The state court correctly recited the governing Strickland standard at page 824 of the appendix to Petitioner's Brief, and it also cited two state court cases that cited that correctly recited the standard. And a state court's decision under this Court's precedent is not contrary to Strickland merely because it later uses a shorthand recitation of the prejudice standard in announcing its resolve. Moreover, the state court's analysis confirms that it both understood and applied the correct standard. It correctly viewed Espinoza's testimony and weighed the effect of that proposed testimony against all of the trial evidence, before concluding that Petitioner failed to show prejudice, which is exactly the type of analysis that Strickland requires. Nor is it a problem or is there any error in the state court's conclusion that Espinoza's testimony would not have resulted in an acquittal. That doesn't betray any misunderstanding of the Strickland prejudice. That conclusion is just an artifact of the way the claim was argued. Petitioner argued that with his testimony that the conversation with Jolene Motalvo never happened and Petitioner never confessed to him, he would not have been accountable and thus would have been acquitted. So there is no contrary to argument here. But whether the claims are viewed deferentially under AEDPA or de novo, Petitioner's Strickland claim fails. As counsel noted, it is helpful to recall that the state argued that Petitioner was accountable for the shooting in two ways, both because he directed Delgado to fire at the Latin Kings, and that even if he didn't, the evidence showed that Petitioner and Delgado were engaged in a common criminal design. And so some of Petitioner's proposed witnesses were offered to undermine the accountability evidence, while others were offered to argue that counsel should have presented a self-defense claim. In this respect, I'll respond. Petitioner highlighted Robert Espinosa's testimony, and he, in fact, was offered to rebut the accountability evidence, to impeach Motalvo's testimony that she had heard Petitioner confess to ordering Delgado to shoot at the Kings. But, in fact, her trial testimony was not all that beneficial to the state, because while she had testified before the grand jury that Petitioner had confessed to shooting, to directing Delgado to shoot, by the time of the trial, she had backed off of that testimony considerably, and she said, in fact, she thought that Delgado had fired because the Kings rushed at the car. And counsel also impeached Motalvo's testimony at trial with the hairdresser. You may recall that Petitioner's counsel called the hairdresser to testify that, according to a notation in her appointment book, Petitioner and Raya had been with her getting their hair cut at about the time that Motalvo thought that this conversation in which Petitioner confessed might occur. But even if we set aside Motalvo's testimony, we still have Rhodes' testimony that Petitioner ordered the shots. Rhodes testified that Petitioner confessed to him that he was a leader of the bishops, and that he called the shots, that he directed Delgado to fire at the Latin Kings, that they used a .45-caliber weapon, and that they later defaced it so that the casings could not be later matched to the gun. And we don't simply have circumstantial evidence here. We do have forensic evidence that corroborates this testimony. So consistent with the Petitioner's admissions to Rhodes, the forensic evidence did establish that the victim sustained a .45-caliber gunshot wound to his face. The shell casing at the scene of both shooting events, first on the corner and then later on 18th Avenue, they matched the .45-caliber handgun that was recovered from Delgado, despite their attempts to deface that gun. And not only that, we have to consider we also have the evidence supporting the state's second theory, the common criminal design theory. And Espinoza's testimony does not undermine that testimony. All the Latin Kings' witnesses gave consistent accounts supporting Petitioner's accountability for the murder under this common criminal design theory. Collectively, they testified that they were asked to leave the party, and shortly thereafter, they were on the nearby street corner. Petitioner's car pulled up. Someone said, King Blink, which was a term of disrespect for the Latin Kings, and then the passenger fired a shot. Petitioner drove away, but he quickly returned, and then they heard three more gunshots. That testimony itself was corroborated by the two disinterested witnesses, the pastor and the woman driving home from work. And Petitioner's girlfriend's testimony, Guadalupe Araya's testimony, also supports the second theory of accountability. As we noted in our brief, she testified that she heard a loud noise before Petitioner and Delgado pulled up to pick her up a mere block from the party. And when they picked her up, they urged her to hurry up and get in the car, told her to duck, which is the district court correctly recognized. It could certainly be viewed as an indication that they intended to put her health and welfare in jeopardy. She sat on the rear floorboard, and although she did testify that she didn't hear Petitioner order the shots, she did say that she felt the car turn, she heard loud bangs, and then she smelled smoke, all of which dovetails with the Latin King witness testimony and the disinterested witness testimony, establishing that Petitioner and Delgado returned a second time to fire additional shots at the Latin Kings. So in light of this overwhelming evidence of guilt, the state court simply reasonably concluded that Petitioner could not show prejudice  And even if this were reviewed under de novo review, the argument would still fail. Counsel also addressed Christian Delgado's testimony. Christian Delgado actually provides testimony going to both theories, both to undermine the evidence of accountability and also to claim viability of a self-defense claim. So as to Delgado's proposed testimony that Petitioner didn't order him to shoot, we know from his own affidavit that he testified to the contrary in his own sentencing hearing. He testified that Petitioner did order him to shoot, which certainly underscores the reasonableness of the state court's conclusion that because his case was at that point still in the pretrial stages, that is, Delgado's case was still in the pretrial stages, he couldn't be relied upon to testify that Petitioner didn't order him to shoot. And had Delgado testified, of course, he would have been questioned about his membership in the gang, Petitioner's membership in the gang, the gang's rivalry with the Latin Kings, whether Petitioner and Delgado held leadership positions, and whether either of them ever carried or regularly carried a gun. And again, the state's accountability argument rested again on these two prongs. So even if the jury did not believe that Petitioner ordered the shots, he was still accountable on that second common design theory. As discussed again, as I reiterated earlier, that evidence was strong and corroborated, and Delgado's testimony doesn't undermine that second theory. As to the viability of a self-defense claim, evidence that Reyes allegedly ran at the car in a threatening manner couldn't satisfy a self-defense claim under Illinois law, which requires proof of use of unlawful force. Simply running at a car is not unlawful force. It's not even a threat of unlawful force. And even if, as Delgado later claimed in a second affidavit, that someone ran at the car holding a black object that appeared to be a gun, counsel could reasonably decline to raise a self-defense claim. And there's no reasonable probability that such a claim would have succeeded because the evidence established that Delgado was the aggressor when he fired the initial shot at the Latin Kings as they stood on the corner when they left that party. And Delgado did not dispute that that first shot was unprovoked. So self-defense was simply unavailable as a matter of state law. Section 7.4, or 7-4, cited in our brief, 720 ILCS 5-7-4, a claim of self-defense is unavailable if the defendant initially provoked the use of force against himself, unless he can show that he exhausted every reasonable means to escape the imminent danger. Now, while it's true, as Petitioner claims, that Illinois law also provides that one has a duty not to become the aggressor, that rule simply doesn't apply on the facts of this case because Petitioner was the initial aggressor, and he didn't exhaust all reasonable means to withdraw from the danger. Instead, he purposefully came back around, he picked up the girlfriend, told her to duck, and then came back around for a second pass and fired the second round of shots. On these facts, Reyes could not become the aggressor. Additional evidence that a guilty plea was not viable on these facts is the fact that Delgado himself pleaded guilty and did not pursue a claim of self-defense. So considered as a whole, counsel's representation here was constitutionally adequate, and he could, as he did here, reasonably elect to prefer to hold the state to its burden rather than risk pursuing a self-defense claim that depended on an unpredictable witness like Delgado, who, again, might or might not testify. He couldn't tell at the time because he was still in the pretrial stages. An unbelievable witness whose testimony would not warrant a jury instruction on self-defense, much less a reasonable probability of a different outcome. And again, we only get to counsel's earlier point about the possibility of an instruction on second-degree murder, unreasonable belief in self-defense. We only get there if, in fact, a self-defense instruction is issued. So no self-defense instruction, no unreasonable belief in self-defense. So there was no reasonable probability of any kind of a compromised second-degree murder verdict here. I would like to go on to talk briefly about the remedy here. We believe, again, as I said, that this court— If I could, I lost contact with you folks for a while. And, Ms. Masters, I missed the last several minutes of your remarks, and I will listen to the tape to make sure that I have that. Ms. Deutsch, I wondered if you could— I had difficulty picturing in my mind the activity of the motions of the car. Could you, on the cold record, but I'd like to get your version of it if I may. The car apparently drove by, and there was a shot across the bow or something of that nature. The car picked up this young lady, and then it did something. It returned. Correct. Did it have to—How did it get back, I guess, is what I'm concerned about. I understand. There were exhibits at trial that were not included in the record. So I, in fact, I had the same problem, Your Honor, and I looked at a Google map, and unhelpfully, the streets in East Moline, the streets and avenues are all numbered. So this party starts—It's not easy. I had considered even putting a map in the appendix to my brief. The party is upstairs of a bar on 13th Street and 15th Avenue. After the dispute over the camera when she kicks the Latin kings out and the girlfriend calls her to come pick him up, they walk over one block to 12th Street and 15th Avenue. That's where Petitioner and Delgado take that first shot. Then they drive around the corner. They sort of drive around the block, and they come down 18th Avenue, and they come up here. They drive around here, and they pick her up, and then they go around essentially around a large block, as I understood it. Again, it's not super clear from the record. This is my interpretation based on looking at a Google map. They pick her up. They tell her, hurry up, get in, duck, and they come back around and basically going back to where they had seen those, trying to find them back on that same corner, although three of them— so they split up. There were five Latin kings. Two went one way, and three of them then ran down an alley and came out on 18th. So they were on 15th and 18th, kind of going in a circle like that, as I understand it. At trial, did the prosecutor argue that there was, in effect, a deliberate return to the site? Yes, Your Honor. That was the basis of the common criminal design. He said, even if you don't, he argued to the jury, even if you don't believe that a petitioner ordered Delgado to shoot, once, you know, they took that first turn and he saw Delgado shoot, right, the first time, and he deliberately drove him back, that was enough for him to be found accountable under a common criminal design theory. I see. Well, we'll let Ms. Masters, when she gets her rebuttal time, contribute what she'd like to. Thank you very much for yours. Absolutely. If I might just briefly speak to the remedy, even if this court— I'll give you three more minutes, and I'll give Ms. Masters the same amount of time. Thank you. Thank you, yes. Just briefly to the remedy, as I said, even if this court finds that there were some deficiency in the state court's judgment and that petitioner has alleged facts that, if true, would entitle him to relief on his Strickland claim, the remedy still isn't a writ of habeas corpus, as petitioner has suggested. Instead, the proper remedy is an evidentiary hearing in the district court where the district court can determine, one, whether petitioner's witnesses will testify as they say they would in their affidavits, or we can evaluate the credibility of the proposed testimony and also evaluate the scope of trial counsel's investigation and the reasonableness of his strategic choices. So unless the court has further questions, we'd ask that this court affirm the district court's judgment. Thank you. Thank you, Ms. George. And Ms. Masters, as I mentioned, you have three additional minutes. Okay. Your Honor, I'm sorry, I think I also had like— Okay. And the rebuttal, right? Yes, whatever time you had. Thank you. Okay. So I'm not quite sure where you lost me, but I'm just going to address some of the points that— The force of your advocacy was so strong, it fried the wires or something between South Bend and— Thank you, Your Honor. I appreciate that. I'd like to begin by making the point to the court that this is not some run-of-the-mill case about an imprecise shorthand of the prejudice standard. This court applied— The state court applied the standard that is recognized as diametrically opposite of the one that is correct. And there's no basis to hold something as shorthand when there's been no longhand in the first place. No case does that. The precedent in this circuit has categorically rejected, would have resulted in an acquittal, as being shorthand or being an appropriate use. And there's no jurisprudential precedent, no jurisprudential principle on which to say that when an appellate court says it's applying the wrong standard, it's somehow doing something different. The cases that the state court cited also did not indicate that reasonable probability of a different result meant that confidence— that there was a reasonable probability to undermine confidence in the outcome or sufficient evidence to undermine confidence in the outcome. That's the problem here. They're proposing a dramatic expansion of deference that would completely undermine AEDPA. It is error. It should be recognized as error. And there isn't some sort of tea leaf reading to try and figure out or to presume that the state court meant something other than it said. Now, counsel also referred to the manner in which the state court applied—analyzed prejudice. Well, in the cases in this court that has held that the application is correct, those cases are Gage and then Carter v. Duncan. In those cases, the evidence that the court is saying isn't sufficient to change the outcome, even though they're calling it some other standard, that evidence is cumulative. And it's not exonerating. That's just not true of Espinoza's affidavit. And I also want to point out that counsel and, in fact, the district court, talk about Montalva's testimony being weak. That is the circumstance in which prejudice occurs. Prejudice occurs when the evidence to convict is weak. And that is something that's actually conceded here about Montalva's confession. It wasn't compelling, but yet she was credible because she wasn't someone swapping her testimony for some lighter prison sentence. And for that reason, too, forensics has nothing to do with accountability. It doesn't say whether he ordered the shots or engaged in a common criminal design. I also want to point out to the court that counsel's run-through of the details of the facts totally misses the boat on the deficient performance issue. Deficient performance is about investigation. It is about whether counsel looked into the defenses that Mr. Olvera could have raised. In this case, it was self-defense. It was compelling. The question of who was the initial aggressor was one that would have been one of fact for a jury. Your Honor asked questions about the route home, the route that they were driving. They were driving home. They were driving home the way they came. That's not hunting someone down. That's not a return to the crime scene. And again, what we know, too, from the car behind Mr. Olvera's car is someone ran out. And we know from Illinois laws quoted in the brief that the people who aren't aggressors can't become aggressors. And once they do, self-defense is a viable defense. So the other point I would make, too, is counsel points to multiple theories of prosecution. That's also a problem, because the compelling theory here is ordered the shots. That was the easy way to convict. That's undermined. And then the other theory of self-defense wasn't presented. I think I'm out of time? Yes, you are. Thank you. Okay. Well, then, for the reasons set forth in our brief, we'd ask that the writ be granted and, or alternatively, that the court grant an evidentiary hearing to resolve these issues. Thank you very much. Thank you. Thanks to both counsel, and the case is taken under advisement.